## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Fay and Perles FSIA Litigation Partnership,<br><br>                          Petitioner,<br><br>v.<br><br>Allen L. Rothenberg,<br>The Law Firm of Allen L. Rothenberg, and<br>The Rothenberg Law Firm LLP,<br><br>                          Respondents. | Civil Action No. _____1:25-cv-08281_____ |

## PETITION TO VACATE ARBITRAL AWARD

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, including 9 U.S.C. §§ 10 and 12, Petitioner the Fay and Perles FSIA Litigation Partnership (the "Partnership") brings this proceeding to vacate the Final Award, dated July 7, 2025, in *Rothenberg v. Fay*, JAMS Ref. No. 1425036110 (the "Arbitration").

## NATURE OF THE ACTION

1. The Partnership commences this proceeding to vacate the Award issued in the Arbitration on the following grounds: (1) the Award violates public policy because it conflicts with the Professional Rules of Conduct, including binding rules that require client consent for a division of attorney's fees; (2) the arbitrator decided issues that were beyond the scope of what the parties agreed to arbitrate by determining that Rothenberg was entitled to fees for clients who fired him or never hired him; and (3) the arbitrator exceeded the limits of his sanctions authority by issuing a grossly disproportionate and impermissibly punitive sanctions award.

2. For these reasons, and as further discussed below, the Award should be vacated in its entirety.

## PARTIES

3.      Petitioner The Fay and Perles Litigation Partnership is a joint venture between attorneys Thomas Fay, who resides in Maryland, and Steven Perles, who resides in Florida.

4.      Respondent Allen L. Rothenberg is an attorney practicing in New York, Washington, D.C., and Pennsylvania. Upon information and belief, Rothenberg resides in Pennsylvania.

5.      Respondent The Rothenberg Law Firm LLP has offices in New York (450 7th Avenue, 44th Floor, New York, NY 10123; 17 Main Street, Suite 314, Monsey, NY 10952); Pennsylvania (1420 Walnut Street, Philadelphia, PA 19102); and New Jersey (811 Church Road, Cherry Hill, NJ 08002; 1 University Plaza Hackensack, NJ 07601; 300 Boulevard of the Americas, Suite 100, Lakewood, NJ 08701).

6.      Respondent The Law Firm of Allen L. Rothenberg is a sole proprietorship. Upon information and belief, it is located in Pennsylvania.

## JURISDICTION AND VENUE

7.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the parties are diverse and the amount in dispute exceeds $75,000.

8.      The Partnership is a citizen of Maryland and Florida.

9.      Upon information and belief, Rothenberg is a citizen of Pennsylvania. This Court has personal jurisdiction over Rothenberg because he owns and runs The Rothenberg Law Firm LLP, which has offices in New York; Rothenberg is barred in New York; and he has consented to arbitration in New York.

10.     Upon information and belief, The Rothenberg Law Firm LLP is a citizen of Pennsylvania, New Jersey, and New York.

11.    Upon information and belief, The Law Firm of Allen L. Rothenberg is a citizen of Pennsylvania.

12.    Venue is proper in this Court because the underlying arbitration was conducted in New York, New York. 9 U.S.C. § 10(a); *see also* 28 U.S.C. § 1391(b)(2). This petition also concerns a dispute that will potentially affect fees to be distributed in *In re 650 Fifth Avenue* (No. 08-cv-10934), which is presently before this Court.

## FACTUAL ALLEGATIONS

13.    The factual background summarized herein is substantially identical to the factual allegations set forth in the September 12, 2025, Petition to Vacate Arbitral Award filed in this Court by Fay and the Fay Law Group, P.A., and in the October 3, 2025, Petition to Vacate Arbitral Award filed in this Court by Steven Perles and the Perles Law Firm, P.C., which pertain to the same Arbitration. *See Fay v. Rothenberg*, No. 1:25-cv-7613 (S.D.N.Y.), Dkt. 1 (the "Fay Petition"); *Perles v. Rothenberg*, No. 1:25-cv-08219 (S.D.N.Y.), Dkt. 1 (the "Perles Petition").

### A.    Summary of Factual Background

14.    In early 2001, Thomas Fay and Steven Perles agreed to work together to pursue cases against Iran under the Foreign Sovereign Immunities Act ("FSIA") to seek redress for Iran's involvement in the 1983 bombing of a Marine barracks in Beirut, Lebanon. As part of those efforts, Fay and Perles created the Fay and Perles FSIA Litigation Partnership. *See* Ex. 1.

15.    Fay and Perles later engaged Rothenberg to assist with referrals, among other client management efforts.

16.    Fay, Perles, and Rothenberg agreed that they would "share equal thirds of the net fees earned in the prosecution of the counts brought on behalf of each claimant [Rothenberg had] referred to [Fay and Perles]."

17.    In 2001, Fay and Perles filed *Peterson v. Islamic Republic of Iran*, No. 1:01-cv-02094 (the "Peterson Action") in the District Court for the District of Columbia. The court issued judgment in favor of the plaintiffs on all issues of liability. *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 65 (D.D.C. 2003). Fay and Perles, through the Partnership, hired 14 attorneys to assist in their efforts to support each plaintiff's claim for individual damages. In September 2007, the court awarded damages totaling approximately $2.66 billion. *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 60 (D.D.C. 2007).

18.    In November 2007, Rothenberg, Fay, and Perles memorialized their agreement regarding the division of attorneys' fees in the Peterson Action (the "Co-Counsel Agreement"), which provided that each of them would receive one-third of the net attorneys' fees obtained in *Peterson* from all claims on behalf of 101 listed servicemen or their estates, or from the listed servicemen's family members or family members' estates, as named in an attached list.  *See* Ex. 2 at 1. The Co-Counsel Agreement also stated, "[t]his agreement shall supersede any prior agreements between us and our firms regarding this matter." *Id.*

19.    In a previous draft of that agreement (the "Draft Co-Counsel Agreement"), Rothenberg had proposed that he, Fay, and Perles "[f]urther" agree as to *future* cases arising from the publicity of the Peterson Action that they would each "provide each other the opportunity … to handle such matters jointly" and "further agree that any legal fee received will be divided equally among those of us who elect to participate in said representation." *See* Ex. 3 at 1.

20.    Fay and Perles had expressly rejected Rothenberg's proposed "further" agreement as to future cases; they crossed out the paragraph regarding future cases and initialed the strike-through. *Id.* The executed Co-Counsel Agreement did not address a division of fees in any cases other than the Peterson Action. Nor did it address any future claims or cases. *See* Ex. 2 at 1.

21.     The *Peterson* action was brought pursuant to written contingent-fee retainer agreements governed by the D.C. Rules of Professional Conduct. Fay and Perles represented all of the *Peterson* plaintiffs. Some *Peterson* plaintiffs referred by Rothenberg also hired Rothenberg.

22.     Each client agreed in each retainer agreement to pay the attorneys, contingent upon and to the extent of collection, a fee of 33 and 1/3 percent of the total gross recovery from all claims and causes of action against Iran and its agents, plus an amount equal to the expenses for the case. The clients further agreed that the fee would be divided among the attorneys in "an equal share" and that expenses would be divided in proportion to each attorney's expenditures.

23.     After the liability judgment was entered in *Peterson*, a series of new lawsuits were filed against the same defendants in the same court. These suits used the findings in the *Peterson* liability judgment to achieve judgments and are referred to as the "Follow-On Cases."

24.     Some of the Follow-On Cases, referred to as "Direct" Follow-On Cases, were generated by the publicity of the Peterson Action or through word of mouth among the Marine families, and directly signed up by Fay and Perles. Rothenberg was not involved.

25.     Due to resource constraints, Fay and Perles referred many of the new plaintiffs to other attorneys and sometimes other plaintiffs hired other attorneys. The majority of the Direct Follow-On Cases were handled primarily by counsel other than Fay and Perles for the initial process of getting judgments for the cases. Some Direct Follow-On Cases were filed by Fay alone or by Fay with co-counsel other than Perles or Rothenberg.

26.     Other Follow-On Cases, referred to here and in the arbitration as "Indirect" Follow-On Cases, were brought by other attorneys and built on the Peterson Action. After those plaintiffs obtained their judgments, Fay and Perles each provided legal services in connection with enforcement of the judgment.  Rothenberg was not involved in those cases.

27.     The attorneys' fees in the Indirect Follow-On Cases were the subject of various agreements. Fay entered fee-splitting agreements with counsel for the plaintiffs in certain Indirect Follow-On Cases. Fay and Perles later reached an agreement with one another by which any fees that Fay earned as co-counsel (and any fees Fay earned in *Fain v. Islamic Republic of Iran*, No. 1:10-cv-00628 (D.D.C.), which Fay filed) would be split between Fay and Perles.

28.     After the damages awards were entered in the Peterson Action in 2007, Fay and Perles began efforts to collect. After discovering Iranian assets worth roughly $1.8 billion that were owned by the Central Bank of Iran and held in an account owned by Clearstream, an international securities transfer system provider, in a branch of Citibank in New York City (the "Clearstream Assets"), Fay and Perles retained other counsel to assist with the collection effort.

29.     In 2010, a turnover action (the "Clearstream Turnover Action") was filed on behalf of the *Peterson* plaintiffs in the District Court for the Southern District of New York. *Peterson v. Islamic Republic of Iran*, No. 1:10-cv-04518 (S.D.N.Y.).

30.     Plaintiffs in other lawsuits who had obtained judgments against Iran, whether in the Follow-On Cases (as they reached judgments) or based on claims arising out of terrorist acts other than the Beirut bombing, filed competing claims to collect from the Clearstream Assets.

31.     The intervenors whose claims did not arise from the Beirut bombing included plaintiffs in four separate actions who had retained Rothenberg as an attorney pursuant to contingent-fee agreements (the "Rothenberg Intervenors"). Rothenberg referred the plaintiffs in those actions to other counsel, Stroock & Stroock & Lavan LLP ("Stroock"), who took those cases to trial in the District Court for the District of Columbia and who, after learning of the existence of the Clearstream Assets, filed to intervene in the Clearstream Turnover Action. Rothenberg testified in the Arbitration that Stroock also represented him. The Rothenberg Intervenors, like

6

other intervenors whose claims did not arise from the Beirut bombing, argued in the Clearstream Turnover Action that their claims had priority over the claims of the *Peterson* plaintiffs.

32.    In February 2012, Fay sent a letter to the *Peterson* plaintiffs explaining the implications of the competing claims. Fay's letter proposed a strategy to speed the resolution of the collection effort and avoid the risk that the *Peterson* claimants would recover nothing from the Clearstream Turnover Action: negotiating a sharing agreement under which the funds recovered from that action would be distributed among *all* of the claimants—the *Peterson* plaintiffs, the plaintiffs in the Follow-On Cases, and the intervenors whose claims did not arise from the Beirut bombing—in proportion to the amount of compensatory damages awarded in each case.

33.    Every one of the *Peterson* plaintiffs, including those who were represented by Rothenberg as well as by Fay and Perles, consented to the proposals to share funds with the Clearstream Assets with other victims of the Beirut bombing and to negotiating an agreement with the intervenors whose claims did not arise from the Beirut bombing.

34.    On February 21, 2012, Fay and Perles signed an understanding with counsel for plaintiffs in the Follow-On Cases filed on behalf of victims of the Beirut bombing. Some, but not all, of those plaintiffs had already obtained judgments for compensatory damages against Iran. Fay and Perles referred to this sharing arrangement as the "Marines Cooperation Agreement."[1] Ex. 4. The parties to that agreement agreed that they would not seek to invalidate one another's claims in the Clearstream Turnover Action and that the total amounts collected by the parties would be pooled and distributed in proportion to each group's judgment amount. *Id.* ¶¶ 1–3. The parties also authorized Fay and Perles to enter into further agreements with other groups that had claims against

---

[1] This arrangement is also referred to in the arbitration papers as the "Follow-On Agreement."

the Clearstream Assets such that the amounts recovered would be divided in proportion to each group's amount of compensatory damages award. *Id.* ¶ 6.

35.     On June 5, 2012, Fay and Perles contacted the *Peterson* plaintiffs to inform them that Fay and Perles had completed negotiations with counsel for the other plaintiffs with claims in the Clearstream Turnover Action. That "Litigation Cooperation and Settlement Agreement" directed 87 percent of recovered funds to the plaintiffs whose claims arose from the Beirut bombing (the "Marines' Share") and the remaining 13 percent of recovered funds to other plaintiffs, which was proportionate to the amounts of their judgments. Ex. 5.

36.     The Litigation Cooperation and Settlement Agreement included only plaintiffs who had already obtained compensatory damages awards against Iran at the time of the agreement. However, it stated that the division of recoveries that it set forth "shall not in any way alter or impact any prior agreements among the individual members of Creditor Party groups and with their respective counsel regarding the division of recoveries within each respective group and any recoveries within any of such groups to subordinate claims to recoveries, all of which prior agreement[s] shall remain in full force and effect." *Id.* § 2.2.3.

37.     Fay's letter to the *Peterson* plaintiffs explained that the Marines Cooperation Agreement to which those clients had already consented would determine how the Marines' share of the *Clearstream I* recovery—that is, 87 percent of the total recovered—would be divided among the plaintiffs with claims arising from the Beirut bombing. As Fay's letter reminded the *Peterson* plaintiffs, the Marines Cooperation Agreement provided that the amounts recovered by Beirut plaintiffs would "be shared with the entire group of victims killed or injured in Beirut, including those who are further behind in litigating their claims."

38.     The Litigation Cooperation and Settlement Agreement also provided that "the payment of any attorneys' fees … incurred by [each group's] respective counsel … will be governed by each [group's] agreement with its respective counsel." *Id.* § 2.5.

39.     Every one of the *Peterson* plaintiffs consented to the Litigation Cooperation and Settlement Agreement.

40.     In 2013, the district court in the Clearstream Turnover Action granted summary judgment in favor of the *Peterson* plaintiffs and directed Citibank to turn over the Clearstream Assets to the court. The court created a Qualified Settlement Fund into which the proceeds of the Clearstream Assets were to be deposited.

41.     Ultimately, approximately $1.65 billion collected from the Clearstream Assets was allocated for the Beirut plaintiffs. Distributions were made from the Qualified Settlement Fund between late 2016 and 2020.

42.     Additional collection efforts for the remaining amount of the judgments obtained for the Beirut plaintiffs—more than $2 billion—are ongoing. Fay and Perles are involved in actions concerning "Clearstream II," another large securities asset seized in New York, and an office building located in Manhattan ("650 Fifth Avenue").

43.     On December 4, 2017, Fay and Perles (along with their Partnership) entered into the Arbitration Agreement with Rothenberg.  Ex. 6.  The Arbitration Agreement provided, among other things, that the parties to the agreement would submit a "Fee Dispute" to arbitration with JAMS. *Id.* at Recitals A–D.

44.     The Arbitration Agreement defined that dispute as follows:

A dispute (the "Fee Dispute") has arisen among the Parties relating to the attorneys' fees and litigation expenses in *Peterson v. Islamic Republic of Iran*, No. 10-4518 (S.D.N.Y.) and Nos. 01-2094 and 01-2684 (D.D.C.), *Valore v. Islamic Republic of Iran*, Nos. 03-1959, 06-516, 06-750 and 08-1273 (D.D.C.), *Murphy v. Islamic*

*Republic of Iran*, No. 06-596 (D.D.C.), and *Estate of Bland v. Islamic Republic of Iran*, No. 05-2124 (D.D.C.) (collectively, the "Beirut Marine Cases"). The Fee Dispute is over whether Rothenberg is entitled to compensation from Fay and Perles caused by and/or related to sharing agreements between the plaintiffs and/or their attorneys in the Beirut Marine Cases (the "Beirut Marine Plaintiffs") and Marine victim and family plaintiffs (not represented by Rothenberg) and/or their attorneys in other actions against the Islamic Republic of Iran (collectively, with the Beirut Marine Plaintiffs, the "Marine Plaintiffs").

*Id.* at Recital A.

45.     The Arbitration Agreement provides that "[t]he Parties acknowledge that they are not executing this Agreement on behalf of any client, whose rights remain unaffected by this Agreement." *Id.* § V.

46.     The Arbitration Agreement further provides that "Fay and Perles shall each be severally liable for 50% of any award against the [Litigation] Partnership in the arbitration contemplated by this Agreement." *Id.* § III.B.

**B.      Summary of the Arbitration**

47.     On September 14, 2021, Rothenberg filed a Demand for Arbitration. Ex. 7.

48.     The Demand alleged that in 2000, Rothenberg, Fay, and Perles had reached an oral agreement "whereby each attorney would be entitled to one-third of the net attorneys' fee on all cases" and that it was pursuant to that agreement that they filed the Peterson Action. Ex. 7 ¶¶ 1–2.

49.     Rothenberg further alleged that the three had had an "oral agreement to pursue claims against Iran collectively" and that "the Parties orally agreed not to take on additional plaintiffs seeking to pursue recovery related to the Beirut bombings." *Id.* at ¶¶ 4–6. According to the Demand, Fay and Perles breached that agreement in the Direct Follow-On Cases. *Id.* ¶ 9.

50.     Rothenberg alleged that the November 28, 2007, Co-Counsel Agreement, which stated that the three firms would evenly divide the attorneys' fees derived from claims on behalf of specified plaintiffs, was reached to resolve a dispute in which Rothenberg claimed entitlement

to one-third of the fees "attributable to all plaintiffs in the Peterson Action." *Id.* ¶¶ 8, 10. He further alleged that the Co-Counsel Agreement "included an implied covenant not to take action to impair the rights of the other parties to the agreement." *Id.* ¶ 12.

51.    The Demand further alleged that Fay and Perles had "found a way to negotiate referral fee arrangements with other attorneys who had filed 'follow-on' claims on behalf of Beirut plaintiffs" even when Fay and Perles were not counsel of record, *id.* ¶ 15.

52.    The crux of the Demand was Rothenberg's assertion that the February 21, 2012, "Follow-On Agreement" (which Fay and Perles referred to as the "Marines Cooperation Agreement") "diluted Rothenberg's attorneys' fees under the Co-Counsel Agreement by reducing the Peterson Plaintiffs' recovery; however, Respondents benefitted from the agreement because the agreement involved a sharing of that recovery with the plaintiffs in the Follow-On Cases, for whom Respondents claimed a greater share of attorneys' fees." *Id.* ¶ 18.

53.    Rothenberg asserted that Fay and Perles "concealed the Follow-On Agreement" from him and that "[t]hrough their actions with respect to the Follow-On Agreement, [Fay and Perles] unjustly enriched themselves at Rothenberg's expense and violated the covenant of good faith and fair dealing." *Id.* ¶¶ 28–29.

54.    He alleged that "Perles and the [Fay and Perles FSIA Litigation] Partnership further breached the Co-Counsel Agreement and enriched themselves at Rothenberg's expense when they recovered from certain of the attorneys in the Follow-On Cases for harm to their attorneys' fees in the Peterson Action, but failed to account to Rothenberg under the Co-Counsel Agreement." *Id.* ¶ 35.

55.    The Demand asserted claims for breach of contract and for unjust enrichment and demanded damages. *Id.* ¶¶ 37–48 & pp. 9, 10.

56.     Rothenberg also asserted that the Parties "have a dispute over the division of future attorneys' fees under the Co-Counsel Agreement as a result of Respondents' actions" and demanded "a declaratory judgment setting forth his entitlement to future attorneys' fees from under the Co-Counsel Agreement sufficient to remedy the dilution and other damages caused by Respondents' improper actions." *Id.* ¶¶ 44–45.

57.     In response, Perles asserted the affirmative defense that Rothenberg's claim for equitable relief was barred by the doctrine of unclean hands because the Rothenberg Intervenors' collection efforts threatened the ability of the plaintiffs in the Peterson Action to collect from the Clearstream Assets. That intervention led to the *Peterson* plaintiffs' sharing agreement with the intervenors, which reduced the recovery of Rothenberg's *Peterson* clients and also resulted in additional fees paid to Rothenberg by the Rothenberg Intervenors.

58.     During the arbitration proceedings, the parties agreed "that the interpretation of the Arbitration Agreement shall be governed by New York Law." The arbitrator later determined that New York law also governed the determination of the Fee Dispute.

59.     In his deposition, Rothenberg testified, regarding the Marines Cooperation Agreement, that "the clients" "had no right to reduce [his] fee." Rothenberg also testified that in his opinion, the Marines Cooperation Agreement provided "no benefit" to the *Peterson* plaintiffs and that Fay and Perles "knew there was no benefit and also never reveal[ed] to them that they were … going to make … additional money, but if even if they did do that … and explained it to them … they had no right to reduce my fee." Rothenberg further claimed that "Perles and Fay forced" the Marines Cooperation Agreement "on the clients."

60.     Despite all this, Rothenberg admitted that he "never" communicated any of these purported concerns regarding whether the *Peterson* plaintiffs benefitted from the Marines

Cooperation Agreement to the clients from whom he received attorney's fees. Nor has he ever advised his clients of his view that they were forced into the Marines Cooperation Agreement.

61.    After that deposition, Fay and Perles grew concerned that Rothenberg was prioritizing his interest in his attorneys' fees over their shared clients' rights to enter into the Marines Cooperation Agreement. Fay and Perles believed that such self-serving behavior raised concerns under the D.C. Rules of Professional Conduct.

62.    Fay and Perles sent a letter on April 16, 2024, to inform the affected clients of their concern that Rothenberg "may have violated duties owed to [the clients]." Fay and Perles also sent that letter to Rothenberg's counsel. The letter explained that Fay and Perles had consulted with ethics counsel. The letter noted that it was "doubtful that anything would have been collected" from the Clearstream Assets "without the sharing agreements." It stated that "if Mr. Rothenberg truly believed that the Marines Sharing Agreement was improper, then he should have told you that at some point and not just advanced claims seeking more attorney fees for himself regardless of what you actually received." The letter emphasized that Fay and Perles understood that it was their ethical duty to inform the clients of information that might affect the clients' ability to collect on their judgments against Iran. The letter explained, "[i]t is now entirely up to you as to what, if anything, you want to do with the information. You have the absolute right to make changes to your legal team or to leave the team intact." And it provided clients with Rothenberg's contact information in case any of them wished to communicate with Rothenberg.

63.    Rothenberg sought an order from the arbitrator requiring Fay and Perles to retract their April 16, 2024, letter. On May 15, the arbitrator denied Rothenberg's request but stated that Rothenberg "shall be permitted to respond … by sending his own letter to the Peterson plaintiffs."

64.     On May 28, Rothenberg wrote to the *Peterson* plaintiffs to ask that they "reserve judgment until receiving [his] response" to the letter from Fay and Perles, "which may or may not come before the arbitration is resolved." Rothenberg never sent an additional "response."

65.     At various times, including at least as early as April 22, 2024, many of the *Peterson* plaintiffs who had originally been referred by Rothenberg wrote to him to terminate his services. Those termination letters were sent solely to Rothenberg. Rothenberg did not inform Fay and Perles of the terminations, nor did he inform the arbitrator of the terminations.

66.     On May 15, the arbitrator ordered Perles and Fay "to facilitate, and not contest," Rothenberg's claim to payment of a "pro rata share of legal fees" in another collection action—this one regarding a property at 650 Fifth Avenue in New York City—"on account of the same individual Peterson plaintiffs from whom [Rothenberg] received legal fees" in the Clearstream Turnover Action. Ex. 8 ("Order 7") at 11. The arbitrator ordered Fay and Perles to deposit into an escrow account a total of $3,200,000 "in attorneys' fees received from the 650 Fifth Avenue Action settlement," which the arbitrator described as "the disputed attorneys' fees." *Id.* at 6.

67.     In addition, the arbitrator ordered Fay and Perles to provide Rothenberg "with a detailed written statement of all communications with the Peterson Plaintiffs, who are [Rothenberg's] clients, regarding [Rothenberg], the April 16, 2024, letter, or the subject of this arbitration" and to "continue" to do so "for any past, present and future communications with the Peterson Plaintiffs who are the Claimant's clients." *Id.* at 9.

68.     In approximately mid-November 2024, Fay and Perles learned from their clients for the first time that some of them who had previously been represented by Rothenberg had terminated him.

69.     It was not until December 2024 that Rothenberg finally disclosed to Fay and Perles the number of *Peterson* plaintiffs who had terminated him after the April 16 letter: "approximately 500" out of "roughly 550." Those former clients continued to be clients of Fay and Perles.

70.     Fay continued to communicate with her clients regarding her ethical concerns about Rothenberg's conduct, including with clients who had already terminated Rothenberg or who did so later. Fay did not know which clients had terminated Rothenberg because neither the clients nor Rothenberg sent notice of termination to Fay. Because a distribution of funds to the clients was forthcoming, Fay consulted ethics counsel. She asked each client if they had sent correspondence to Rothenberg, and if they had, to forward that correspondence to Fay. Fay also requested such information from Rothenberg's counsel but did not get a response.

71.     Rothenberg moved for sanctions under JAMS Rule 29, arguing that Fay's communications violated the arbitrator's order.

72.     Over Fay's and Perles's objections, the arbitrator granted Rothenberg's motion and issued an interim award. *See* Ex. 9 (the "Interim Award"). Central to awarding sanctions was the Arbitrator's claim that he had "enjoined [Perles and Fay] from communicating any adverse information about the [Rothenberg] to any of the *Peterson* plaintiffs." Ex. 9 at 5. The arbitrator drew what he called an "adverse inference … that the Respondents are cloaking themselves in the Rules of Professional Conduct to steal the Claimant's fees derived from the plaintiffs he represents in the *Peterson* action." *Id.* at 17–18. Citing his sanctions authority under JAMS Rule 29, the arbitrator awarded "payment to the Claimant of any shortfall in attorneys' fees from the *Peterson* plaintiffs that he represented when the [Qualified Settlement Fund] distributed the Clearstream I asset, due to his discharge of representation of any of them, and the attorneys' fees he collects from

their recoveries" in ongoing collections actions, "or any other matter from which these clients recover payments on their judgments." *Id.* at 18.

73.     Fay moved for reconsideration and vacatur of Order 7 and of the Interim Award, which the arbitrator denied.  The arbitrator later issued a Corrected Interim Award, included within the final award, *nunc pro tunc* to April 10, 2025. *See* Ex. 10 at 64–75.  After Perles pointed out that arbitrator had never prohibited Fay and Perles "communicating any adverse information about the Claimant to any of the Peterson plaintiffs or their counsel until the Final Award is issued in this arbitration," the arbitrator removed that language from the Corrected Interim Award. *Compare* Ex. 9 at 5, *with* Ex. 10 at 66.

74.     In the Final Award, the arbitrator "reject[ed] [Rothenberg's] arguments that the Respondents engaged in any wrongdoing by entering into the Marines Cooperation Agreement on behalf of their clients." Ex. 10 at 40. Because the clients "had the right to agree to share the Clearstream I asset with other plaintiffs" and to agree "to the dilution of the Claimant's attorneys' fees," Respondents, who entered into the Marines Cooperation Agreement on behalf of their clients, did nothing wrong. *Id.* at 40.

75.     The arbitrator also determined that "the Respondents' failure to advise the Claimant of the Marines Cooperation Agreement does not constitute a breach of the parties' contract," *i.e.*, the Co-Counsel Agreement, because "even if the Claimant had been aware of the Marines Cooperation Agreement, it was the Claimant's own clients' decision, not the Respondents' decision, to participate in that sharing, and it was the clients' decision to participate that diluted the Claimant's fees." *Id.* at 41–42.

76.     Next, the arbitrator found that the ruling in Respondents' favor on the breach-of-contract claim "dooms that branch of the Claimant's request as set forth in his Demand for

Arbitration for a judgment declaring his entitlement to future attorneys' fees pursuant to the November 27, 2007, Co-Counsel Agreement sufficient to remedy the dilution of his attorneys' fees." *Id.* at 51–52. Accordingly, the arbitrator entered a declaration in favor of Fay and Perles on that issue. *Id.*

77.    Nevertheless, despite having rejected the dilution theory underpinning the Demand, the arbitrator proceeded to rule in favor of Rothenberg on portions of his other claims and award him millions of dollars in attorneys' fees from clients who had never hired him.

78.    First, the arbitrator found in favor of Rothenberg on what the arbitrator called one "branch" of Rothenberg's claim for unjust enrichment. The arbitrator found that when Fay and Perles negotiated with counsel in the Indirect Follow-On Cases for a share of attorneys' fees, "they were unjustly enriched at the Claimant's expense." *Id.* at 47–48. The arbitrator stated that in light of Rothenberg's contribution to the *Peterson* "work product" by referring plaintiffs, there was "no excuse" for Fay and Perles to "have excluded" Rothenberg "from the negotiation of these fees." *Id.* at 49. The arbitrator awarded Rothenberg $6,589,416 on this unjust-enrichment theory. *Id.* at 79.

79.    The arbitrator also denied Rothenberg's request "for a judgment declaring that the Respondents are directed to facilitate and not contest in any way [Rothenberg's] claim to direct payment of his one-third *pro rata* share of legal fees from any future recovery by the same individual *Peterson* plaintiffs from whom Claimant received legal fees in" the Clearstream Turnover Action. But the arbitrator stated that "[t]he denial of this branch of relief does not alter or affect the sanctions awarded" in the Interim Award. *Id.* at 52–53.

80.    Finally, the arbitrator found that due to the ruling in Rothenberg's favor on the unjust enrichment claim, Rothenberg was entitled to a declaration "that the Respondents shall pay

to the Claimant 21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of" certain specified Indirect Follow-On Cases, "without the Claimant's 21.61% of those fees coming into Respondents' possession." *Id.* at 53–54.

## GROUNDS FOR VACATING THE AWARD

**A.      The award violates public policy because it conflicts with the Professional Rules of Conduct.**

81.      The Partnership incorporates paragraphs 1-80 as if fully set forth herein.

82.      A court may vacate an arbitration award if it determines that enforcement of the award would violate public policy. *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011).

83.      For an award to be vacated on this basis, "the public policy must be 'well defined and dominant' and must be 'ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.* (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987)).

84.      Here, the Award conflicts with well-established rules of professional conduct by, among other things, effectively rewriting fee agreements without client consent by allocating fees to Rothenberg for clients that fired him or never hired him.

85.      For example, D.C. Rule of Professional Conduct Rule 1.5(e) provides that "[a] division of a fee between lawyers who are not in the same firm may be made only if," among other things, "[t]he client is advised, in writing, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged" and "[t]he client gives informed consent to the arrangement." *See also* N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0, Rule 1.5(g) (parallel rule in New York rules of professional conduct).

86.    Here, the *Peterson* plaintiffs that fired Rothenberg did not consent to him receiving fees. The Indirect Follow-On plaintiffs that never hired Rothenberg also did not consent to him receiving fees, nor did they benefit from his limited work as part of the *Peterson* action.  Perles and Fay contributed more than a decade of onerous work and leadership that resulted in the liability decision and all the subsequent enforcement proceedings, which assisted the plaintiffs in the Indirect Follow-On Cases in procuring judgments against Iran. But Rothenberg's only involvement was locating a portion of the *Peterson* plaintiffs.

87.    Yet the arbitrator granted Rothenberg fees for those plaintiffs anyway by (1) awarding Rothenberg "any shortfall between attorneys' fees from the Peterson plaintiffs that he represented when the [Qualified Settlement Fund] distributed the Clearstream I asset, due to his discharge of representation by any of them, and the attorneys' fees he collects from their recoveries in the 650 Fifth Avenue and USVSST matters, or any other matter from which these clients recover payments on their judgments"; (2) awarding Rothenberg $6,589.416 in damages under an unjust enrichment theory premised on the notion that he is entitled to fees from clients he never represented; and (3) on the same theory, declaring that Fay and Perles must pay Rothenberg "21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of [certain] Indirect Follow-On cases." Ex. 10 at 78–81.

88.    "[T]he Rules of Professional Conduct, at least to the extent that they are designed and interpreted to protect the public interest, express a clear mandate of public policy." *Weiss v. Carpenter, Bennett & Morrissey*, 672 A.2d 1132, 1144 (N.J. 1996); *Matter of Silverberg*, 75 A.D.2d 817, 819 (N.Y. App. Div. 2d Dep't 1980) (holding that because "lawyers play a vital role in society," a contract provision that violated the rules of professional conduct is "void and unenforceable" as a matter of "public policy" and therefore "cannot be the subject of arbitration").

89.    Rule 1.5(e) reflects a particularly "well defined and dominant" public policy. *See* Restatement (Third) of the Law Governing Lawyers § 47 cmt. e (2000) (observing that "fee-splitting arrangements" are "not permissible" absent "disclosure and client consent"); Am. Bar Ass'n Model Rules of Pro. Conduct R. 1.5(e) (2020); *Silverberg*, 75 A.D.2d at 819 (staying arbitration of contract on the ground that the contract's "division of legal fees without regard to services actually rendered" is "void and against public policy"). In fact, this public policy is so dominant that at least 47 of the 50 states have the same or a similar rule.[2]

90.    Accordingly, the Award should be vacated in its entirety because it is predicated on violations of important public policies.

**B.    The arbitrator decided issues that were beyond the scope of what the parties agreed to arbitrate.**

91.    The Partnership incorporates paragraphs 1-80 as if fully set forth herein.

92.    Under Section 10(a)(4) of the FAA, this Court may vacate an arbitration award if it finds that the arbitrator "exceeded [his] power[]." 9 U.S.C. § 10(a)(4).

93.    An arbitrator exceeds his power if he decides an issue beyond the scope of what the parties agreed to arbitrate, "effectively dispens[ing] his own brand of ... justice." *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 578 (S.D.N.Y. 2024) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)).

94.    Here, the arbitrator resolved disputed issues not covered by the Arbitration Agreement and the Demand.

---

[2] Am. Bar Ass'n, Variations of the ABA Model Rules of Professional Conduct, Rule 1.5: Fees (last updated Mar. 2025), https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/mrpc-1-5.pdf.

95.    The Demand raised three claims for arbitration: a breach-of-contract claim, a declaratory judgment claim, and an unjust enrichment claim. All of these claims were based on Rothenberg's theory that the Marines Cooperation Agreement and the Litigation Cooperation and Settlement Agreement had diluted his anticipated fees from the Peterson Action by allowing other victims of Iran-backed terrorism to share in any recovery from the same pool of assets.

96.    None of Rothenberg's claims addressed whether Fay, Perles, or the Partnership allegedly had any obligation to include him in discussions with other attorneys when they negotiated fees for themselves in certain of the Follow-on Cases. And for good reason: Rothenberg had proposed such an arrangement in his draft of the Co-Counsel Agreement in 2007, Fay and Perles had specifically rejected that proposed provision, and Rothenberg agreed to sign the Co-Counsel Agreement without that provision. *Supra* ¶¶ 18–20.

97.    The Arbitration Agreement did not authorize the arbitrator to resolve any and all potential disputes between the parties regarding fees in cases against Iran. Instead, the Agreement defined the outer boundary of the "Fee Dispute" as "relating to the attorneys' fees and litigation expenses in *Peterson v. Islamic Republic of Iran*, No. 10-4518 (S.D.N.Y.) and Nos. 01-2094 and 01-2684 (D.D.C.), *Valore v. Islamic Republic of Iran*, Nos. 03-1959, 06-516, 06-750 and 08-1273 (D.D.C.), *Murphy v. Islamic Republic of Iran*, No. 06-596 (D.D.C.), and *Estate of Bland v. Islamic Republic of Iran*, No. 05-2124 (D.D.C.) (collectively, the 'Beirut Marine Cases')." With respect to fees and expenses in *those* cases, the sole question the parties agreed to arbitrate was "whether Rothenberg is entitled to compensation from Fay and Perles caused by and/or related to sharing agreements between the plaintiffs and/or their attorneys in the Beirut Marine Cases (the 'Beirut Marine Plaintiffs') and Marine victim and family plaintiffs (not represented by Rothenberg) and/or

their attorneys in other actions against the Islamic Republic of Iran (collectively, with the Beirut Marine Plaintiffs, the 'Marine Plaintiffs')." Ex. 5 at Recital A.

98.     The "Fee Dispute" thus referred to the alleged dilution of Rothenberg's fees from the Peterson Action as a result of the "sharing agreement" referenced in the Demand—*i.e.*, the Marines Cooperation Agreement. *See* Ex. 7 ¶¶ 14–18.

99.     The arbitrator ruled against Rothenberg on the dilution theory underlying the claims submitted in the Demand. *See* Ex. 10 at 39–42.

100.    Instead of simply resolving the dispute before him, however, the arbitrator proceeded to "dispense[] his own brand of [economic] justice," *Eletson*, 731 F. Supp. 3d at 578 (quoting *Stolt-Nielsen*, 559 U.S. at 671)—reaching out and deciding *other* disputes that were not set forth in the Demand and the Agreement. The dispute the parties agreed to arbitrate had nothing to do with whether Rothenberg was entitled to fees as a result of Fay's communications with their shared clients (which had not happened yet) or as a result of Fay and Perles allegedly not including him in negotiations with plaintiffs in the Indirect Follow-On Cases so that he could get a cut of the fees from those cases.

101.    Accordingly, the Award should be vacated in its entirety on the ground that the arbitrator exceeded his authority by deciding issues not contemplated by the Agreement.

### C.     The arbitrator exceeded the limits of his sanctions authority.

102.    The Partnership incorporates paragraphs 1-80 as if fully set forth herein.

103.    An arbitrator exceeds his power when he "impose[s] [his] own policy choice" about the outcome of a dispute, rather than "applying a rule of decision derived from the FAA" or the terms of the relevant arbitration agreement. *Stolt-Nielsen*, 559 U.S. at 676–77.

104.    Here, the arbitrator exceeded his authority by issuing a draconian sanctions award to punish Fay for allegedly not disclosing to Rothenberg certain communications to shared clients.

Nothing in the JAMS rules or in the parties' Agreement authorized such extraordinary sanctions, and New York law and public policy unequivocally forbids punitive arbitration awards.

105.    The parties to the arbitration agreed that New York law applied to their Agreement. *Supra* ¶ 58. New York law and public policy prohibits arbitrators from awarding punitive damages. *See Fahnestock & Co. v. Waltman*, 935 F.2d 512, 518 (2d Cir. 1991) (holding that a district court exercising diversity jurisdiction in action seeking to vacate arbitration award must apply New York law barring arbitrators from awarding punitive damages).

106.    Although the arbitrator did not explicitly characterize the sanctions award as one for punitive damages, it was clearly punitive in character. "[P]unitive damages are invoked to punish egregious, reprehensible behavior." *Virgilio v. City of New York*, 407 F.3d 105, 116 (2d Cir. 2005); *see also Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 926, 944-45 (N.D. Cal. 2003) (concluding that an arbitrator lacked the power "to impose mounting punitive sanctions" in the form of a $10,000 daily fine).

107.    The sanctions award was not "tailored ... to compensate" Rothenberg for losses resulting from Fay's alleged violation of the court's May 15, 2024 order requiring disclosure of communications to shared clients, *New York & Presbyterian Hosp. v. New York State Nurses Ass'n*, No. 1:24-CV-05648 (JLR), 2024 WL 5107586, at *5 (S.D.N.Y. Dec. 13, 2024); after all, Fay undisputedly disclosed many of those communications to Rothenberg, and the vast majority of Rothenberg's clients decided to fire him anyway. Rather, the arbitrator punished Fay and Perles for what he evidently saw as an effort "to steal the Claimant's fees." *See, e.g.*, Ex. 10 at 78. The arbitrator made Fay and Perles liable, permanently and irrevocably, for any "shortfall" in fees resulting from the voluntary decisions of *hundreds* of Rothenberg's clients to terminate his representation, even though some of those terminations occurred *before* the arbitrator's May 15,

2024 order, and even though Fay *had* informed Rothenberg of at least some communications. Were it upheld, the sanctions award could amount to tens of millions of dollars in liability for Fay and Perles.

108.    "[T]here is no clearer example" of arbitrators exceeding their powers than when they award punitive damages in a case under New York law, where punitive arbitration awards are expressly prohibited. *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991); *see also John T. Brady & Co. v. Form-Eze Sys., Inc.*, 623 F.2d 261, 264 (2d Cir. 1980) ("[W]here the damages are genuinely intended to be punitive ... the courts [should] vacate the award" (quotation marks omitted)).

109.    The sanctions award was also clearly improper to the extent that it functioned as a substitute for tort damages. "Sanctions may not be used as a substitute for tort damages, and must be used to 'deter improper behavior, not to compensate the victims of it or punish the offender.'" *Delaney v. HC2, Inc.*, 761 F. Supp. 3d 641, 666 (S.D.N.Y. 2025) (quoting *Universitas*, 784 F.3d at 103), *appeal docketed*, No. 25-73 (2d Cir. Jan. 10, 2025).

110.    Nor was such a drastic and disproportionate sanction authorized by JAMS Rule 29 or the Arbitration Agreement.

111.    JAMS Rule 29 authorizes an arbitrator to "order *appropriate* sanctions for the failure of a Party to comply with its obligations under [JAMS] Rules or with an order of the Arbitrator." (emphasis added). Sanctions may "in extreme cases" include "determining an issue or issues *submitted to Arbitration* adversely to the Party that has failed to comply." (emphasis added).

112.    A sanction obviously is not "appropriate" if it is plainly illegal.

113.    Moreover, the Arbitrator's sanction was not "appropriate" because it was grossly disproportionate to the conduct sanctioned.  The sanction went beyond even the "extreme" remedy

referenced in Rule 29 because the arbitrator decided an issue that was *not* submitted to arbitration—whether Rothenberg is entitled to damages as a result of Fay allegedly encouraging their shared clients to fire him.  In requiring that any sanction ordered by an arbitrator be "appropriate," Rule 29 indicates that a sanction should not be arbitrary and capricious, nor grossly disproportionate to the non-compliance at issue.  Courts recognize similar limits on their abilities to sanction parties.  *See Bulkmatic Transp. Co. v. Pappas*, 2002 WL 975625, at *2 (S.D.N.Y. May 9, 2002) ("Generally speaking, sanctions should be proportional to the gravity of the offense").

114.    The Arbitrator's sanction was not tailored or proportioned to remedy the purported non-disclosure of communications with clients. No order ever prevented Fay, Perles or Rothenberg from communicating with the *Peterson* plaintiffs, and Rothenberg himself communicated with the *Peterson* plaintiffs by letter in May 2024, *see supra* ¶ 61.

115.    In his Interim Award, the Arbitrator intended to compensate Rothenberg for Fay's communication alerting the *Peterson* plaintiffs of Rothenberg's alleged ethical misconduct. The Arbitrator deemed these communications to have violated an order which he did not actually issue. The Arbitrator appeared to have reasoned that but for the letter, the *Peterson* plaintiffs would not have terminated him, and he would have suffered no diminution in fees. However, even after recognizing that he had not prohibited communications with the *Peterson* plaintiffs, *compare* Ex. 9 at 5, *with* Ex. 10 at 66, the Arbitrator nevertheless left the quantum of monetary sanction unchanged in the Corrected Interim Award. He simply swapped the basis of the sanctions order to a failure to *notify* Rothenberg of otherwise permissible communications. This stubborn adherence to his original sanction was not "appropriate" and was entirely unmoored from any harm caused by the alleged failure to inform Rothenberg of certain communications, which caused Rothenberg zero financial harm.

116.    The result was a draconian sanctions award worth millions more than the underlying claims, which the Arbitrator refused to reconsider, even after he was corrected that Perles and Fay had not been enjoined from communicating with *Peterson* plaintiffs about the arbitration or Rothenberg, and even after Perles submitted evidence he and Fay had actively sought to *avoid* enriching themselves in the event that clients terminated Rothenberg.

117.    The Sanctions Award grossly exceeded the scope of the Arbitrator's authority, as it was not "appropriate" to award Rothenberg millions of dollars from Perles and Fay as a remedy for Fay's purported failure to disclose communications that were not otherwise prohibited.  *See Kashner Davidson Sec. Corp. v. Mscisz*, 531 F.3d 68, 79 (1st Cir. 2008) (vacating sanctions award from arbitration panel where it violated applicable rules).

### D.    The arbitrator manifestly disregarded the law.

118.    The Partnership incorporates paragraphs 1-80 as if fully set forth herein.

119.    In issuing the Final Award, the Arbitrator also manifestly disregarded well-defined, explicit, and clearly applicable legal principles in at least three regards.

### i.    *The Arbitrator's award of unjust enrichment manifestly disregarded the rules of professional conduct.*

120.    As explained above, *supra* ¶¶ 85–89, the Rules of Professional Conduct do not permit lawyers to divide legal fees with outside lawyers without first obtaining client consent.

121.    Here, the Arbitrator found that Rothenberg owned one-third of the *Peterson* Action "work product" and that Fay and Perles were therefore unjustly enriched by using that work product to negotiate fees for themselves in the Follow-On Cases to Rothenberg's exclusion. Ex. 10 at 46–48. As a result, the Arbitrator awarded Rothenberg as damages "21.61% of the attorneys' fees from the Indirect Follow-On Cases from past and future recoveries in those cases." *Id.* at 62, fn. 34.

122.    However, the plaintiffs in the Indirect Follow-On Cases never hired Rothenberg and did not consent to him receiving attorneys' fees in connection with their actions. They also did not even benefit from his limited work as part of the *Peterson* action. Whereas Perles and Fay contributed the work and strategy that assisted the plaintiffs in the Indirect Follow-On Cases in procuring judgments against Iran, Rothenberg only located a portion of the *Peterson* plaintiffs.

123.    Thus, the Arbitrator's award of unjust enrichment manifestly disregards the rules of professional conduct concerning the division of legal fees.

### ii.    *The Award manifestly disregarded the law on unjust enrichment.*

124.    Under New York law, a party is unable to recover under a theory of unjust enrichment when a contract governs the parties' relationship. *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). Because the theory of unjust enrichment lies as a quasi-contract claim, "[i]t is an obligation the law creates *in the absence of any agreement.*" *Id.* (citing *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)) (emphasis in original).

125.    Here, the Arbitrator concluded that Perles, Fay, and Rothenberg had entered into a valid contract when they signed the Co-Counsel Agreement, pursuant to which the parties agreed to share equally in the attorneys' fees earned from the *Peterson* Action. Ex. 10 at 35–38.

126.    Fay and Perles specifically "crossed out the paragraph referencing the obligation to provide one another with the right to handle jointly any claims that came their way in the future." *Id.* at 33-34. Rothenberg agreed to this modified form of the Co-Counsel Agreement, and the Arbitrator found that his decision to "stand down on this request" for a share of the attorneys' fees from new cases constituted part of the consideration sufficient to support the Co-Counsel Agreement. *Id.* at 36-37.

127.    Despite concluding that the scope of the Co-Counsel Agreement did not cover the issue of Rothenberg's entitlement to fees from the Follow-On Cases, *id.* at 46-47, the Arbitrator held that the existence of the Co-Counsel Agreement did not bar this "branch" of Rothenberg's unjust enrichment claim. *Id.*

128.    Here, the parties specifically bargained to exclude Rothenberg's entitlement to attorneys' fees from Follow-On Cases in the Co-Counsel Agreement, forming the very consideration that Rothenberg argued supported its validity.

129.    Therefore, the Arbitrator manifestly disregarded the law barring unjust enrichment claims where a contract exists. *See Beth Isr. Med. Ctr.*, 448 F.3d at 586; *see also G & G Invs., Inc. v. Revlon Consumer Prods. Corp.*, 283 A.D.2d 253, 253 (1st Dep't 2001) ("Since a valid contract exists governing the subject matter in dispute, the cause of action for unjust enrichment is untenable.").

### *iii.    The Award manifestly disregarded the law on unclean hands.*

130.    In response to the Demand, Perles asserted the affirmative defense of unclean hands as a bar to Rothenberg's claim for equitable relief based on his numerous acts of misconduct during the Clearstream Asset collection effort, which diluted the *Peterson* Plaintiffs' recovery and attorneys' fees to which Fay and Perles were entitled, to Rothenberg's own benefit.  *See supra* ¶ 57.

131.    Specifically, Rothenberg represented plaintiffs in four other separate actions against Iran (the Rothenberg Intervenors). Instead of entering his appearance as counsel in these cases, Rothenberg hired the Stroock firm to act as trial counsel, which obtained judgments in each of the cases and undertook collection on them by intervening in the Turnover Action. *Supra* ¶ 31.

132.    That intervention threatened the ability of the plaintiffs in *Peterson* and the Follow-On Cases to recover and forced them to agree to share their award with the intervening plaintiffs through the Litigation Cooperation and Settlement Agreement. *Supra* ¶ 32.

133.    These agreements reduced the recovery of Rothenberg's *Peterson* clients and also resulted in additional fees paid to Rothenberg and less to Perles and Fay.

134.    The Arbitrator failed to address whatsoever Perles' arguments that Stroock, which also represented Rothenberg personally, threatened the *Peterson* Plaintiffs' recovery of the Clearstream Asset by its intervention in the Turnover Action.   Rothenberg's connection with Stroock concerning its efforts to challenge the *Peterson* Plaintiffs' entitlement to any of the Clearstream Asset in favor of his other clients (the Rothenberg Intervenors) is precisely the sort of wrongful conduct that should bar him from relying on unjust enrichment to recover from Fay and Perles.

## **PRAYER FOR RELIEF**

Accordingly, Petitioner requests that the Court enter an Order that:

A.    Vacates the Award; and

B.    Grants such other and further relief as the Court shall deem just and proper.

DATED:  October 6, 2025

**KING & SPALDING LLP**

*/s/ Matthew D. McGill*
Matthew D. McGill
Alexander Kazam
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
matthew.mcgill@kslaw.com
akazam@kslaw.com

**MORRISON COHEN LLP**

Danielle C. Lesser
Edward P. Gilbert
909 Third Avenue
New York, NY 10022
(212) 735-8600
dlesser@morrisoncohen.com
egilbert@morrisoncohen.com

*Attorneys for Petitioner the Fay and Perles*
*FSIA Litigation Partnership*